IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RAMONT LOWELL RICHARDSON, JR.

        Plaintiff,

v.

WELLPATH HEALTH CARE, et. al.,

        Defendants.

**CIVIL ACTION NUMBER:**

**1:20-cv-00777**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant, Bobby Kimbrough, by and through counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and submits this Memorandum of Law in Support of his Motion for Summary Judgment seeking dismissal of Plaintiff's claims against him with prejudice.

### NATURE OF THE CASE

On August 26, 2020, Plaintiff, who is *pro se*, filed his Complaint against a number of Defendants, including Defendant Kimbrough, alleging that his constitutional rights were violated during his incarceration at the Forsyth County Law Enforcement and Detention Center ("FCLEDC"). [See generally, D.E. 2]. On December 21, 2020, the Plaintiff filed a Letter Motion seeking to amend his Complaint [D.E. 3]. On March 8, 2021, the Magistrate Judge reviewed Plaintiff's Complaint and Letter Motion pursuant to 28 U.S.C. § 1915(A), and dismissed a number of Defendants from Plaintiff's lawsuit except Defendant

Kimbrough, and co-Defendant Dr. Alan Rhoades. [See generally, D.E. 4]. The Magistrate Judge also interpreted Plaintiff's Letter Motion as a Motion to Amend and allowed Plaintiff to add additional allegations against Defendant Kimbrough. [Id. at p. 1]. Specifically, the Magistrate Judge found that Plaintiff had stated a claim against Defendant Kimbrough, in both his individual and official capacities, since Defendant Kimbrough is the Sheriff and is therefore the policy making agent for the Forsyth County Sheriff's Office. [Id. at p. 4]. The Magistrate Judge further found that the allegation that Defendant Kimbrough "denied Plaintiff masks and testing for Covid-19 for more than two- and one-half months while eleven officers and an unknown number of inmates at the Detention Center tested positive for the virus…. [was] sufficient to state a potential claim for relief" and determined that Defendant Kimbrough would remain in the lawsuit in both his individual and official capacities "based on the allegation that he denied Plaintiff proper protection from Covid-19. [Id. at p. 3-4, 6 quoting D.E. 2 at p. 21]. The Plaintiff was granted *in forma pauperis* status, and his Complaint and Amended Complaint, were allowed to proceed against Defendant Kimbrough and co-Defendant Dr. Alan Rhoades. [Id. at p. 6].

On June 3, 2021, Defendant Kimbrough was served with Plaintiff's Complaint and the undersigned made an appearance the same day and also moved to extend the time to file an answer. [D.E. 24, 25, 26]. The undersigned's motion was granted and Defendant answered Plaintiff's Complaint on July 23, 2021. [See Text Order dated June 16, 2021, D.E. 28]. The Court then issued a Scheduling Order and ordered that discovery shall be

completed by April 22, 2022.[1] [See Text Order dated August 17, 2021]. Defendant gave notice of his intent to file a dispositive motion on May 2, 2022 seeking dismissal of all claims with prejudice. [D.E. 35]. The following Memorandum of Law will address claims of deliberate indifference against Defendant Kimbrough ("Defendant") regarding the FCLEDC's handling of the COVID-19 pandemic from the dates listed in Plaintiff's Complaint and Amended Complaint.

## STATEMENT OF FACTS

During all times referenced in Plaintiff's Complaint, and his subsequent Amended Complaint, he was incarcerated as a pre-trial detainee at FCLEDC. [See Generally, D.E. 2 and 3]. The Plaintiff alleges that Defendant failed to take adequate precautions to protect him against the spread of COVID-19, and complains that Defendant denied him masks and testing during his incarceration for two-and one-half months while 11 officers tested positive for COVID-19. [D.E. 2 p. 21]. In his Amended Complaint, Plaintiff further alleges that on December 10th and 11th of 2020, that he was exposed to COVID-19 when 24 inmates tested positive for the virus. [D.E. 3]. The approximate dates for Plaintiff's incarceration at the FCLEDC are from April 9, 2020 until May 19, 2021. [Warren Affidavit at ¶ 3].

---

[1] Plaintiff moved to dismiss co-Defendant Dr. Alan Rhoades from this lawsuit on November 19, 2021, and the Court removed co-Defendant Alan Rhoades leaving Defendant Kimbrough as the only remaining Defendant. [D.E. 34, See Text Orders dated November 19, 2021].

3

On March 11, 2020 the World Health Organization declared that COVID-19 was a global pandemic, and on March 13, 2020, the United States issued a nationwide state of emergency. See Center for Disease Control and Prevention, *CDC Museum COVID-19 Timeline* (last updated November 29, 2021), available at https://www.cdc.gov/museum/timeline/covid19.html (last visited May 17, 2022). The State of North Carolina followed suit and declared a state of emergency to coordinate responses and protective actions to prevent the spread of COVID-19. See Official Website of the State of North Carolina, *COVID-19 Orders & Directives* (last updated May 4, 2022), available at https://www.nc.gov/covid-19/covid-19-orders-directives (last visited May 17, 2022).

On March 13, 2020, the FCLEDC began taking precautions to protect inmates and staff against the spread of COVID-19. In a General Memorandum ("GM") issued by the Forsyth County Sheriff's Office, the FCLEDC began screening new residential intakes, and also detention staff, Wellpath medical staff ("medical staff" or "Wellpath"), contractors, and anyone else who worked at the jail ("staff"). [Warren Aff. at ¶¶ 6, 7; See also Exhibits 2-8 to Warren Aff.]. These precautions included temperature checks and questions to screen for potential respiratory illness. [Id.]. Any staff member who answered "yes" to any of the questions, or had a temperature of 100 degrees or higher, was denied entry. [Id.]. If a new intake answered "yes" to any of the questions, or had a temperature of 100 degrees or higher, medical staff advised on where to house those individuals. [Id.]. The FCLEDC designated an area of the facility to house inmates who had, or were

4

suspected of having COVID-19. [Id.]. This often included the use of negative pressure rooms which are rooms with lower pressure on the inside so that if a door is opened, air cannot escape. [Id.]. All air from inside a negative pressure at the FCLEDC is pumped out of the facility through an exhaust vent. [Id.]. Also during this time the FCLEDC suspended public visitation and provided inmates with educational material on how to protect themselves from the virus. [Id.; See also Ex. 7, 9].

In early April of 2020, the FCLEDC took further precautions to prevent the spread of COVID-19 by altering their intake procedures. All new intakes, regardless as to whether they were symptomatic or asymptomatic, were placed in single cells and quarantined for 14 days which included the use of negative pressure rooms. [Id. at ¶¶ 7, 8; See also Ex. 11]. The FCLEDC also limited the number of inmates that could shower at a time from 10 to 4 so inmates could remain 6 feet apart. [Id. at ¶ 8, See also Ex. 11]. After 14 days, and so long as they did not exhibit any signs of COVID-19 as determined by medical, they were allowed to enter general population. [Id.]. The FCLEDC also canceled their daily "muster" so detention staff would not have to congregate in order to receive their daily assignments. [Id.; See also Ex. 12]. Instead, detention staff entered the facility one at a time to individually receive their assignments. [Id.].

On April 13, 2020, the FCLEDC required staff to wear personal protective equipment ("PPE") that included an N95 mask, gown, and goggles when interacting with new intakes who had, or were suspected of having COVID-19. [Id. at ¶ 9; See also Ex. 13]. Afterwards, those cells were sanitized and any worn PPE was disposed of as biohazard

waste. [Id]. These intakes were then quarantined in a designated area of the facility, which often included the use of negative pressure rooms, and could only enter general populations after the 14-day quarantine period, and if cleared by medical. [Id. at ¶¶ 6, 8, 9; See also Ex. 2, 13]. The FCLEDC also placed hand sanitizer throughout the facility and increased their sanitation efforts. [Id. at ¶ 10; See also Ex. 14].

On April 22, 2020, the FCLEDC required all staff assigned to new intake housing units, or units with inmates suspected of having COIVD-19, to wear N95 masks. [Id. at ¶ 11; See also Ex. 15]. Then in a GM dated April 28, 2020, all staff and inmate workers were required to wear surgical masks throughout the entire facility. [Id.; See also Ex. 16]. During this time inmates were given two masks and were provided with educational material on how to properly wear them. [Id.; See also Ex. 17, 31]. They could also exchange these masks out on a nightly basis. [Id.].

On May 21, 2020, the FCLEDC implemented similar quarantine procedures for new intakes with special medical needs. The FCLEDC also required inmates who left the jail for outside medical appointments, or went to the emergency room, to wear a surgical mask the entire time outside of the facility. [Id. at ¶ 12; See also Ex. 18]. These inmates also had to thoroughly was their hands once they returned, and inmates who visited the emergency room had to quarantine for 14 days. [Id.]. The FCLEDC also made efforts to limit outside medical appointments for only those that were necessary. [Id. at ¶ 12; See also Ex. 19].

Beginning in April of 2020, the FCLEDC worked with State and Federal Courts to promote social distancing and limit person-to-person contact. Many proceedings such as

first appearances, guilty pleas, and arraignments were done by video so inmates would not have to physically appear in court. [Id. at ¶ 13; See also Ex. 23, 24, 25]. Additionally, "weekenders" were suspended. [Id. at ¶ 13; See also Ex. 26]. A "weekender" is a person ordered to serve an active prison sentence where they are allowed to serve such time in increments, on the weekends. [Id.].

In mid-May of 2020, the State updated its testing guidance to test any person in which COVID-19 was suspected, which gave medical more leeway in deciding who should be tested. [Id at ¶ 15; See also Ex. 32]. In early June of 2020 medical staff began testing new intakes who exhibited signs of COVID-19. [Id.]. Then on June 12, 2020, when 5 detention staff members tested positive for COVID-19, all inmates were given additional surgical masks and instructed to wear them at all times for the next 14 days. [Id. at ¶ 5; See also Ex. 1, 20]. Beginning on June 25, 2020, in conjunction with the Forsyth County Department of Public Health and Wellpath, the FCLEDC arranged for a mass testing event for all inmates and staff. [Id. at ¶ 15; See also Ex. 21]. This was mandatory, and any inmate who refused was placed in quarantine. [Id. at ¶¶ 8, 15]. From this event there were zero (0) positive tests amongst inmates and four (4) positive tests amongst staff. [Swift Affidavit at ¶4]. The first inmate to test positive for COVID-19 occurred on July 6, 2020, when a new inmate came through intake. [Swift Aff. at ¶5]. On June 29, 2020, the FCLEDC formally entered into an agreement with Wellpath and the Forsyth County Department of Public Health to test all new intakes for COVID-19 regardless as to whether they exhibited signs of the virus. [Warren Aff. at ¶ 16; See also Ex. 32]. All COVID-19 testing was

7

performed by Wellpath and any future discretionary testing that was not part of an established procedure, such as the testing all new intakes, was a decision to be made by Wellpath. [Id.].

Regarding the FCLEDC's mask mandates, all staff at the facility were consistently reminded about these mandates through word-of- mouth, emails, and general memorandums. [Id. at ¶ 13; See Ex. 27, 28, 29, 30]. The Plaintiff was tested for COVID-19 on June 25, 2020, August 7, 2020, December 16, 2020, and December 19, 2020. [Swift Aff. at ¶ 6; See also Ex. 1, 2, 3, and 4 to Swift Aff.]. With the exception of some resumed limited visitation, all of the aforementioned precautions remained in effect throughout the dates listed in this lawsuit. [Warren Aff. at ¶ 17].

## QUESTIONS PRESENTED

1. **Whether there exists a genuine issue of material fact as to whether Defendant violated Plaintiff's Eighth Amendment rights through deliberate indifference.**

2. **Whether Defendant is entitled to qualified immunity**

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings, discovery, and disclosure of materials on file, along with any affidavits, show that there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact, and once the moving party has met its burden, the nonmoving party must then affirmatively demonstrate with specific evidence that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S.Ct. 2548 (1986), *Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348 (1986). In deciding whether a genuine issue of material fact exists, the Court does not have to accept as true unwarranted inferences, unreasonable conclusions, or irrational arguments. *Eastern Shore Mkts. v. J.D. Assocs. Ltd.*, 213 F.3d 175, 180 (4th Cir. 2000).

## ARGUMENT

**1.** **Defendant did not violate Plaintiff's Eighth Amendment rights through deliberate indifference and there is no genuine issue of material fact.**

Under the Eighth Amendment, prison officials must "provide humane conditions of confinement [by] ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). To determine whether an inmate's "conditions of confinement amount to 'cruel and unusual punishment,'" the court evaluates the alleged unconstitutional conditions "against 'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 844-45.

As with any Eighth Amendment claim, a conditions of confinement claim has objective and subjective components. *Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019). "To satisfy the 'objective' prong, an inmate must 'demonstrate that the deprivation alleged

9

was, objectively, sufficiently serious.'" *Id.* (quoting *Scinto*, 841 F.3d at 225). And "[t]o be 'sufficiently serious,' the deprivation must be 'extreme' — meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from…exposure to the challenged conditions.'" *Id.* (quoting *Scinto*, 841 F.3d at 225); see also *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

The subjective prong requires a petitioner challenging his conditions of confinement to "demonstrate that prison officials acted with deliberate indifference." *Id.* at 361; *Scinto*, 841 F.3d at 225. "To prove deliberate indifference, [petitioners] must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 837). However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *Odom v. South Carolina Dep't of Corr.*, 349 F.3d 765, 770 (4th Cir. 2003). The Eighth Amendment does not require prison officials "to take all conceivable steps to prevent the spread of COVID-19, provided their response to the virus remains reasonable." *Hallin v. Scarantino*, 466. F. Supp. 3d 587, 607 (E.D.N.C. 2020). Furthermore, isolated incidents are insufficient to establish an Eighth Amendment violation (*Id.* at 607) ("isolated incident of failure to follow quarantine policy are not sufficient, in this context, to establish an Eighth Amendment violation").

10

Here, the Plaintiff alleges that Defendant failed to take adequate precautions to protect him against the spread of COVID-19 and complains that Defendant denied him masks and testing during his incarceration for two and one-half months while 11 officers tested positive for COVID-19. [D.E. 2 p. 21]. He further alleges, in his Amended Complaint, that on December 10th and 11th of 2020, he was exposed to COVID-19 when 24 inmates tested positive for the virus. [D.E. 3]. The Plaintiff believes that the aforementioned allegations put him at a greater risk for contracting COVID-19, which he believes is cruel and unusual punishment under the Eighth Amendment. [D.E. 8, pp. 6, 15]. The Defendant does not dispute that he was aware of the risks posed by COVID-19. However, the Defendant acted more than reasonably, especially when considering CDC Guidance and Executive Orders from North Carolina Governor Roy Cooper at the time.[2] [See Attachment A, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities in Correctional and Detention Facilities* ("CDC Guidance")].

### a. Sanitation and Education

CDC Guidelines recommended that detention facilities increase their sanitation efforts by cleaning surfaces more often in common areas, ensuring that adequate cleaning supplies are available, and encouraging people to wash their hands more frequently. [CDC

---

[2] CDC guidance provides a useful benchmark in determining whether the facility's policies and procedures are appropriate. Although Respondents have followed the guidelines recommended by the CDC, any alleged hypothetical failure to follow such guidelines simply does not, without more, state a constitutional violation. See e.g. *Hickox v. Christie*, 205 F.Supp.3d 579 (D.N.J. Sept. 2, 2016).

Guidance at pp. 9-10, 17-18]. They also encouraged facilities to provide educational material to inmates on how to protect themselves against the spread of COVID-19. [Id. at p. 22]. In response, the FCLEDC placed hand sanitizer throughout the facility, ordered additional cleaning supplies, and used hospital grade cleaner to disinfect parts of the facility. [Warren Aff. at ¶¶ 9, 10; See also Ex. 1, 14]. For inmates in quarantine, detention staff sanitized their cells and disposed of any worn PPE as biohazard waste. [Id. ¶ 9; also Ex. 13]. If an inmate left the facility, they had to thoroughly wash their hands upon return. [Id. ¶ 12; See also Ex. 18]. Additionally, educational information on how to protect against the spread of COVID-19, and on how to properly wear a mask, was placed throughout the facility in informational kiosks. [Id. at ¶ 7, 11; See also Ex. 9, 17].

### b. Operations

CDC Guidelines recommended that detention facilities implement alternatives to in-person court appearances, and that non-urgent outside medical appointments be postponed. [CDC Guidance at p. 9. The FCLEDC worked with State and Federal Courts to establish remote proceedings so that inmates would not have to leave the facility. Matters such as first appearances, arraignments, and guilty pleas were conducted by video so that inmates would not have to physically appear in court. [Warren Aff. at ¶ 13; See also Ex. 23, 24, 25]. Additionally, the practice of allowing people to serve prison time on the weekends was suspended. [Id.; See also Ex. 26]. The FCLEDC also prioritized only necessary outside medical appointments for inmates, with many of these appointments

12

being done by video. [Id. at ¶ 12; See also Ex. 19]. Public visitation was also indefinitely suspended with the exception of attorneys. [Id. at ¶ 7; See also Ex. 8].

### c. *Screening Procedures*

CDC Guidelines recommended that detention facilities perform pre-intake screening for all new entrants. [CDC Guidance at pp. 9, 10, 12]. The FCLEDC also complied with these recommendations by establishing temperature checks and asking screening questions. [Warren Aff. at ¶ 7; See also Ex. 5, 6, 7]. All new intakes and staff entering the facility were asked a series of questions to screen for potential respiratory illness. [Id. at ¶ 7; See also Ex. 5, 6]. Any staff member who answered "yes" to any of the questions was denied entry. [Id.]. If a new intake answered "yes" they were quarantined in a particular part of the jail, and/or placed in a negative pressure room for 14 days. [Id. at ¶¶ 6, 7; See also Ex. 2, 8]. Similarly, if a staff member had a temperature of over 100 degrees or higher, they were denied entry while inmates were quarantined as previously stated. [Id.]. Inmates were only allowed to enter general population after the 14-day quarantine period, and if cleared by medical. [Id. at ¶ 8]. These screening procedures occurred outside of the facility, and for inmates they occurred in the sally port as recommended by the CDC. [Id. ¶ 7; See also Ex. 6, p. 2].

### d. *Quarantine and Social-Distancing*

The CDC also provided guidance on when to quarantine inmates, and on how to socially distance within a detention facility. [CDC Guidance at pp. 11]. The interim guidance only called for the quarantining of new intakes, who either had, or were suspected

13

of having COVID-19, or came in close contact with someone suspected of having COVID-19. [Id.]. For these individuals, the CDC recommended that they quarantine in isolation for 14 days. [Id.]. The FCLEDC went above and beyond these recommendations as early as March 13, 2020, before the CDC published their interim guidance. The FCLEDC quarantined all new intakes regardless as to whether they were asymptomatic, or came in contact with someone suspected of having COVID-19. [Warren Aff. at ¶ 8; See also Ex. 11, 12]. Not only were all new intakes screened for COVID-19 through questions and temperature checks, but they were also placed in single cells for 14 days, and so long as they did not show any signs of COVID-19, as determined by medical, they were allowed to enter general population. [Id.]. New intakes with COVID-19 symptoms were quarantined in a designated part of the facility, which often included the use of negative pressure rooms, and again could only enter general population if cleared by medical after 14 days. [Id ¶¶ 6, 8; See also Ex. 2, 11, 12]. Inmates who left the facility for the emergency room also had to quarantine, even if they were asymptomatic. [Id. at ¶ 12; See also Ex. 18, 19.]. The FCLEDC also limited the number of inmates who could shower at a time so that inmates could remain 6 feet apart. [Id. ¶ 8; See also Ex. 11, 12]. The Plaintiff alleges that he was exposed to COVID-19 when 11 staff members tested positive for the virus, and that he was exposed a second time in December of 2020 when 24 inmates tested positive. [D.E. 2 at p. 21; D.E. 3]. Even if true, these allegations are mere isolated incidents that are insufficient to establish an Eight Amendment violation. *Hallin v. Scarantino*, 466. F. Supp. 3d 587, 607 (E.D.N.C. 2020)

14

### e. *Personal Protective Equipment*

CDC Interim Guidance also made recommendations for the use of PPE. [CDC Guidance at p. 25]. For inmates, the CDC recommended they wear face masks only if they had COVID-19, or were in close contact with someone suspected of having COVID-19. [Id.]. The CDC also recommended that inmates wear gloves and gowns if they handled items such as food and laundry that came from either an inmate with COVID-19, or one suspected of having COVID-19. [Id.]. The FCLEDC complied with these recommendations by providing inmates with masks and supplying inmate workers assigned to new intake housing with N95 masks, instead of only providing masks to inmates who had COVID-19 or were in close contact with someone suspected of having COVID-19. [Warren Aff. at ¶ 11; See also Ex. 16, 17, 31.]. Inmates could also exchange their masks out on a nightly basis. [Id.]. On June 12, 2020, when several staff members tested positive, the FCLEDC gave every inmate two additional surgical masks and asked for them to be worn at all times for the next 14 days, rather than only providing surgical masks to inmates who were in close contact with the positive staff members, which is what the CDC would have recommended. [Id. at ¶ 14; See also Ex. 20]

For staff, the CDC recommended that only certain PPE should be worn in areas that housed inmates with COVID-19, or inmates suspected of having COVID-19. [CDC Guidance at p. 25]. Specifically, the CDC said staff assigned to such areas should wear a face mask, eye protection, gloves, and a gown. [CDC Guidance at p. 25]. These requirements also applied to staff members assigned to quarantined areas of a detention

center, regardless as to whether those cells housed symptomatic or asymptotic inmates such as new intakes. [Id.]. At this time the CDC did not recommend that all detention staff wear facemasks and neither did the State of North Carolina. The first mask guidance potentially applicable to detention facilities occurred on June 24, 2020 when North Carolina Governor Roy Cooper issued an Executive Order that required face coverings for long term care facilities. See Executive Order No. 147, *Extension of Phase 2 Order and New Measures to Save Lives in the COVID-19 Pandemic* (2020).

Even before Governor Cooper's Executive Order, the FCLEDC established mask mandates for staff. On April 13, 2020, the FCLEDC required staff members assigned to housing units with inmates who had, or were suspected of having COVID-19, to wear N95 masks, gowns, and gloves. [Id. at ¶ 9; See also Ex. 13]. Then on April 22, 2020, the FCLEDC required staff members to wear N95 masks, gowns, and gloves if assigned to any of the new intake units, regardless as to whether an inmate was asymptomatic. [Id. at ¶11; See also Ex. 15]. Finally, on April 28, 2020, the FCLEDC required all staff to wear surgical masks while inside the facility. [Id.; See also Ex. 16]. The Plaintiff alleges that the FCLEDC did not enforce its mask mandates, however the evidence establishes the opposite. In addition to establishing mask mandates at the FCLEDC, staff were consistently reminded about them mandates through word-of-mouth, emails, and general memorandum. [Id. at ¶ 11; See also Ex. 27, 28, 29, 30]. If they the FCLEDC did not enforce its mask mandates, they would have not bothered to remind staff about them on June 5, June 11, October 14, and December 3 of 2020. [Id.].

16

### f. Testing

On May 15, 2020, the North Carolina Department of Health and Human Services ("NCDHHS") recommended generally, that only those suspected of having COVID-19 should be tested. See North Carolina Department of Health and Human Services, *NCDHHS Updates Guidance on Who Should be Tested for COVID-19* (last updated May 15, 2020), available at https://www.ncdhhs.gov/news/press-releases/2020/05/15/ncdhhs-updates-guidance-who-should-be-tested-covid-19 (last visited February 25, 2022). Medical staff at the FCLEDC began testing symptomatic new intakes approximately two weeks before the June 24, 2020 mass testing event. [Warren Aff. at ¶ 15]. Then beginning on June 24, 2020, the FCLEDC in conjunction with the Forsyth County Department of Public Health, held a mass testing event that lasted several days for all inmates and detention staff. [Warren Aff. at ¶ 4]. Of the approximately 900 staff members and inmates who were tested, there were only 4 staff members who tested positive and 0 inmates. [Swift Aff. at ¶4]. The first inmate to test positive at the FCLEDC occurred on July 6, 2020 upon intake. [Id. at ¶ 5]. Afterwards, on June 29, 2020, the FCLEDC formally entered into an agreement with Wellpath and the Forsyth County Department of Public Health to test all new intakes for COVID-19 regardless as to whether they exhibited signs for the virus. [Warren Aff. at ¶16; See also Ex. 33]. All COVID-19 testing was performed by Wellpath and any future discretionary testing that was not part of an established procedure, such as testing all new intakes, was a decision to be made by Wellpath. [Id.].

17

Regarding Plaintiff's claim that he was denied COVID-19 testing, the evidence establishes the opposite. Records from the Forsyth County Department of Public Health show that Plaintiff was tested for the virus on June 25, 2020, August 7, 2020, December 16, 2020, and again on December 19, 2020. [Swift Aff. at ¶; See also Ex 1, 2, 3, and 4 to Swift Aff.]. Since records show that Plaintiff was tested, his claim that Defendant denied him COVID-19 testing is without merit.

The FCLEDC, and therefore Defendant, took more than reasonable efforts to protect the Plaintiff against the spread of COVID-19. The Defendant followed CDC Guidelines and North Carolina Executive Orders. Additionally, regarding Plaintiff's claims about masks and PPE, the evidence shows that inmates were provided with masks and that Defendant both established and enforced its mask mandates. Also contrary to Plaintiff's claim that he was denied testing, the evidence shows that he received multiple COVID-19 tests during his incarceration. Since Defendant acted more than reasonably in protecting Plaintiff against the spread of COVID-19, and because Defendant established and enforced mask mandates provided Plaintiff with COVID-19 testing, there is no genuine issue of material fact as to whether Defendant violated Plaintiff's Eighth Amendment rights. As such, his lawsuit alleging deliberate indifference under to 42 U.S.C. § 1983 should be dismissed with prejudice.

**2.    Defendants are Entitled to Qualified Immunity.**

The Defendants are entitled to summary judgment on the basis of qualified immunity because their actions were objectively reasonable, "assessed in light of the legal

18

rules that were 'clearly established at the time the action was taken.'" *Harlow v. Fitzgerald*, 457 U.S.800, 818 (1982). Even if the factual allegations in the Complaint are taken as true, the Defendants' actions did not violate any clearly established constitutional right of which a reasonable public official would have known. Therefore, the Defendants are entitled to qualified immunity. E.g., *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Once the specific constitutional right at issue is identified, the Court must determine whether that right was clearly established by pre-existing law at the time of the alleged violation. *Wilson v Layne*, 526 U.S. 603, 609 (1999). Preexisting law for purposes of determining qualified immunity is law that "has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state," *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) aff'd, 526 U.S. 603 (1999).

That the right must be specifically delineated is emphasized in *White v. Pauley*, __U.S.__, 137 S. Ct. 548, 552 (2017):

> Qualified immunity attaches when an official's conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Mullenix v. Luna*, 577 U.S. , at —— – ——, 136 S.Ct. [305 (2015)], at 308. While this Court's case law " 'do[es] not require a case directly on point' " for a right to be clearly established, " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " Id., at ——, 136 S.Ct., at 308. In other words, immunity protects " 'all but the plainly incompetent or those who knowingly violate the law.' " Ibid.

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. See, e.g., *City and County of San Francisco v. Sheehan*, 575 U.S. ——, ——, n. 3, 135 S.Ct. 1765, 1774, n. 3, 191 L.Ed.2d 856 (2015) (collecting cases). The Court has found this necessary both because qualified immunity is important to " 'society as a whole,' " ibid., and because as " 'an immunity from suit,' " qualified immunity " 'is effectively lost if a case is

19

erroneously permitted to go to trial,' " *Pearson v. 552 Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

*White*, 137 S. Ct. at 551–52 (emphasis added).

In *Ross v. Russell*, Civil Action No. 7:20-cv-000774, 2022 WL 767093 (W.D. Va. Mar. 14, 2022), the Western District of Virginia considered an inmate's allegations that correctional facility defendants took steps that increased the possibility that he and other inmates would contract COVID-19. The inmate complained, among other things, that he was not given hand sanitizer or cleaning materials, he was housed with inmates who had tested positive for COVID-19, officers at the jail were not provided proper personal equipment other than masks and gloves, and he was moved into a cell that had not been cleaned after an inmate who was very ill from COVID-19 had been released. *Ross v Russell*, at *10. In *Ross*, the Court determined that the risk of exposure to COVID-19 satisfied the first element of an Eighth Amendment conditions claim. *Id.* at *10. Regarding the second element, the Court found the defendants had created a comprehensive pandemic policy that comprised a reasonable attempt to respond to the known risk of COVID-19 exposure. *Id.* at *12. The Court also concluded that, even if the defendants were deliberately indifferent, they were entitled to qualified immunity because the "COVID-19 pandemic was a new and unusual issue, and there was ongoing and changing guidance from health officials at both the state and federal levels." *Id.* at *14.[3]

---

[3] See also *Tate v. Arkansas Department of Corrections*, 2020 WL 7378805 (E.D. Ark, Central Div. 2020) (finding that prison officials were entitled to the defense of qualified immunity.)

Here, similar to the *Ross* case, the Defendant should be entitled to qualified immunity. As mentioned earlier, the Defendant took numerous precautions to protect inmates against the spread of COVID-19 that included increased sanitation efforts, educating inmates about COVID-19, altering intake procedures, screening entrants to the FCLEDC, quarantining and social distancing, providing PPE and establishing mask-mandates, and testing inmates for the virus. Furthermore, even if the Defendant was deliberately indifferent, he should be entitled to qualified immunity since the COVID-19 pandemic was a new and unusual issue, and because of the ongoing and changing guidance from health officials at both the state and federal levels, especially when considering that the timeframe in this lawsuit is similar to the October 2020 timeframe in *Ross*. As such, the Defendant should be entitled to qualified immunity and the Court should grand Defendant's Motion for Summary Judgement and dismiss Plaintiff's case with prejudice.

## CONCLUSION

WHEREFORE, based upon the foregoing arguments, the Defendant respectfully request that his Motion for Summary Judgment be granted, that the case be dismissed with prejudice, and for such other and further relief that the Court deems just and proper.

[Signature to Follow}

21

Respectfully submitted, this the <u>19th</u> day of May, 2022.

<div style="margin-left:50%">

<u>/s/ Andrew R. Marshall</u>
Andrew R. Marshall
N.C. Bar No. 41412
Forsyth County Attorney's Office
Assistant County Attorney
201 North Chestnut Street
Winston Salem, NC 27101
Phone: 336-703-2030
Fax: 336-727-8241

</div>

## <u>CERTIFICATION OF WORD COUNT</u>

The undersigned counsel hereby certifies that this Memorandum in Support of Defendant's Motion for Summary Judgment complies with the word count requirement pursuant to L.R. 7.3(d)(1) and does not exceed 6,250 words, as counted by the word processing software utilized by counsel for the defendants.

Respectfully submitted, this the <u>19th</u> day of May, 2022.

BY: <u>/s/ Andrew R. Marshall</u>
Andrew R. Marshall
N.C. Bar No. 41412
Forsyth County Attorney's Office
Assistant County Attorney
201 North Chestnut Street
Winston Salem, NC 27101
Phone: 336-703-2030
Fax: 336-727-8241
Email: marshaar@forsyth.cc

23

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2022, I served the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment on the *pro se* Plaintiff by depositing the same in the United States Postal Service mail addressed to Raymont Lowell Richardson, Jr. 03453-509, Bennettsville Federal Correctional Institution, Inmate Mail/Parcels, P.O. Box 52020, Bennettsville, SC 29512, and with the Clerk of Court using the CM/ECF system which will send notification to:


Patrick J. Scott
Teague Campbell Dennis & Gorham
P.O. Box 19207
Raleigh, NC 27610-9207
pscott@teaguecampbell.com
*Attorney for Defendant Dr. Alan Rhoades*

Jennifer Bryant Milak
Teague Campbell Dennis & Gorham
P.O. Box 19207
Raleigh, NC 27610-9207
jmilak@tcdg.com
*Attorney for Defendant Dr. Alan Rhoades*



BY:     /s/ Andrew R. Marshall
   Andrew R. Marshall
   N.C. Bar No. 41412
   Forsyth County Attorney's Office
   Assistant County Attorney
   201 North Chestnut Street
   Winston Salem, NC 27101
   Phone: 336-703-2030
   Fax: 336-727-8241
   Email: marshaar@forsyth.cc

24