RAMONT LOWELL RICHARDSON, JR., )
)
        Plaintiff, )
)
    v. )      1:20cv777
)
WELLPATH HEALTH CARE et. al., )
)
        Defendants. )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on Defendant Bobby Kimbrough's ("Kimbrough") Motion for Summary Judgement (Docket Entry 36; see also Docket Entry 37 (Memorandum in Support)) (collectively, the "Summary Judgment Motion")). For the reasons that follow, the Court should grant the Summary Judgment Motion.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Ramont Lowell Richardson, Jr. (the "Plaintiff"), a pretrial detainee acting pro se, commenced this action against several Defendants, including Kimbrough, for acts and/or omissions amounting to deliberate indifference to Plaintiff's serious medical needs during his detention at Forsyth County Law Enforcement Detention Center ("FCLEDC"). (See Docket Entry 2 (the "Complaint") at 1-38.) As relevant here, Kimbrough, the Forsyth County Sheriff (id. at 5), allegedly failed to follow statewide mandates for face coverings as

a result of the COVID-19 pandemic (see id. at 8), and refused to provide a face mask or COVID-19 test to Plaintiff (see id. at 21). He also allegedly allowed an inmate to move into Plaintiff's cell after testing positive for COVID-19. (See id. at 20–21.)

Pursuant to 28 U.S.C. § 1915A(a), the Court (per the undersigned) screened the Complaint to determine whether, inter alia, it "fails to state a claim upon which relief may be granted," 28 U.S.C. § 1915A(b)(1). (See Docket Entry 4 (the "Recommendation") at 1.) In connection with that review, the undersigned concluded that the Complaint adequately stated a claim only against Kimbrough for allegedly "den[ying] Plaintiff masks and testing for C[OVID]-19 for more than two and one[-]half months while eleven officers and an unknown number of inmates at the Detention Center tested positive for the virus" (id. at 3).[1] Accordingly, the undersigned recommended that the Court dismiss all claims except those against Kimbrough. (See id. at 6.) The Court (per Chief United States District Judge Thomas D. Schroeder) ultimately adopted the Recommendation, ordering "that Plaintiff's deliberate indifference claim[] against Defendant[] Kimbrough [ is]

---

1 The Court (per the undersigned) also concluded that the Complaint adequately stated a claim against another Defendant, Rhoades, for allegedly "fail[ing] to allow Plaintiff to see a specialist for [fragments in Plaintiff's body following a gunshot wound to his head and partial immobility on his right side or] . . . to receive physical therapy to regain the use of his right side" (id. at 5). Plaintiff, however, later moved to amend his Complaint and drop Rhoades as a Defendant, which the Court granted. (See Docket Entry 34; Text Order dated Nov. 19, 2021.)

2

allowed to proceed but that the remainder of the claims in the complaint are dismissed pursuant to 28 U.S.C. § 1915A for failing to state a claim upon which relief may be granted." (Docket Entry 10 at 2.)

Thereafter, the Parties commenced discovery. (See Text Order dated Aug. 17, 2021 (adopting Scheduling Order).) After discovery closed, Kimbrough moved for summary judgment. (See Docket Entry 36; see also Docket Entry 37 (Memorandum in Support); Docket Entry 38 (supporting affidavit); Docket Entry 41 (supporting affidavit).) On May 19, 2022, the Clerk sent Plaintiff a letter advising him of his "right to file a 20-page response in opposition . . . within 30 days from the date of service of [Kimbrough's Summary Judgment Motion] upon [him]." (Docket Entry 40 at 1.) The letter specifically cautioned Plaintiff that a "failure to respond or . . . file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that [Kimbrough's] contentions are undisputed and/or that [Plaintiff] no longer wish[es] to pursue the matter," as well as that, "unless [Plaintiff] file[s] a response in opposition to the [Summary Judgment Motion], it is likely . . . summary judgment [will be] granted in favor of [Kimbrough]." (Id.) Despite these warnings, Plaintiff did not respond. (See Docket Entries dated May 19, 2022, to present.) Given that lack of response and the fact that Plaintiff did not verify the factual allegations in the Complaint

3

(see Docket Entry 2 at 38 (certification that "the factual allegations have evidentiary support" for purposes of Federal Rule of Civil Procedure 11)), Plaintiff's bare allegations cannot controvert facts which the Summary Judgment Motion or record establish.  See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (recognizing that party's failure "to respond to a summary judgment motion may leave uncontroverted those facts established by the motion").[2]  For the reasons that follow, no genuine issue of material fact remains and the Court should grant the Summary Judgment Motion.

## II. DISCUSSION

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S.

---

2 By local rule, "[i]f a respondent fails to file a response within the time required . . ., the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice."  M.D.N.C. LR 7.3(k).  However, the Fourth Circuit requires substantive review of even unopposed motions for summary judgment.  See Custer, 12 F.3d at 416 ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

4

242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "draw[s] all reasonable inferences in favor of the non-moving party. Emmons v. City of Chesapeake, 982 F.3d 245, 250 (4th Cir. 2020). However, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)). Rather, the Court must "find that a reasonable jury could return a verdict for [the nonmoving party in order for] a genuine factual dispute [to] exist[] . . . ." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

### B. Deliberate Indifference

Turning to the constitutional deprivation alleged here,

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989) (emphasis added). Courts evaluate pretrial detainees' conditions of confinement in state custody under the Due Process Clause of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 (1979). "The due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections

5

available to the convicted prisoner." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). "Thus, deliberate indifference to the serious medical needs of a pretrial detainee violates the [D]ue [P]rocess [C]lause." Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001).

In other words, "even though [a pretrial detainee's deliberate-indifference] claim arises under the Fourteenth Amendment, [courts] have traditionally looked to Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs." Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021). The Eighth Amendment requires that prison officials "provide humane conditions of confinement," which includes, among other things, "ensur[ing] that inmates receive adequate . . . medical care," Farmer v. Brennan, 511 U.S. 825, 832–33 (1994).

To make out a constitutional claim for deprivation of medical care, a plaintiff must show that a defendant "acted with 'deliberate indifference' (subjective) to [the plaintiff's] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). A medical need qualifies as serious if it "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted). A defendant displays deliberate indifference when he possesses knowledge of the risk of harm to an inmate and knows that

6

"his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis and internal quotation marks omitted); see also Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) ("To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" (brackets in original) (quoting Farmer, 511 U.S. at 837)).

"The subjective component . . . sets a particularly high bar to recovery." Iko, 535 F.3d at 241. In particular, "deliberate indifference entails something more than mere negligence, . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted).

### C. Liability Under Section 1983

"A state official can be liable in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity." King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016). As to personal liability, the plaintiff must "show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985). "As a general matter, a [state

7

actor] may incur [Section] 1983 liability only through affirmative misconduct." Randall v. Prince George's Cnty., 302 F.3d 188, 202 (4th Cir. 2002) (quoting Parratt v. Taylor, 451 U.S. 527, 535–36 (1981)). "[Section] 1983 must be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). Accordingly, "it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge, 550 F.2d at 928).

"Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." Graham, 473 U.S. at 165 (internal quotation marks omitted). "To state a[n official-capacity] cause of action . . . a [S]ection 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008).

As for supervisory liability, under Fourth Circuit authority,

> a supervisor can be liable [under Section 1983] where (1) he knew that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) his response showed deliberate indifference to or tacit

> authorization of the alleged offensive practices; and (3) [] there was an affirmative causal link between his inaction and the constitutional injury.

King, 825 F.3d at 224 (internal quotation marks omitted). For the first element, "[e]stablishing a pervasive and unreasonable risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted). Relatedly, a plaintiff ordinarily cannot satisfy the second element "by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) (internal citation omitted). However, "[a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates." Id. And as for the third element, proof of causation "may be direct . . . where the policy commands the injury of which the plaintiff complains[,] [o]r the causal link may be supplied by tort principle that holds a person liable for the natural consequences of his actions." Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983).

9

### D. Kimbrough's Summary Judgment Motion

Kimbrough has sought summary judgment on the grounds that he responded reasonably (and thus necessarily without deliberate indifference) to the risks posed by the COVID-19 pandemic. (See generally Docket Entry 37 at 11-18 (highlighting how the Detention Center implemented CDC Guidance with respect to sanitation and education, operations, screening procedures, quarantining and social distancing, personal protective equipment, and testing).) Alternatively, Kimbrough has contended that, if constitutional violations occurred, qualified immunity shields him from liability. (See id. at 18-21 (citing Ross v. Russell, No. 7:20cv000774, 2022 WL 767093 (W.D. Va. Mar. 14, 2022) (unpublished), and Tate v. Arkansas Dep't of Corr., No. 4:20CV558, 2020 WL 7378805 (E.D. Ark. Nov. 9, 2020) (unpublished), recommendation adopted, 2020 WL 7367864 (E.D. Ark. Dec. 15, 2020) (unpublished)).) As already noted, Plaintiff did not respond to Kimbrough's arguments. (See Docket Entries dated May 19, 2022, to present.)

Applying a liberal construction to the Complaint, the Court may interpret Plaintiff's allegations in one of two ways. First, Plaintiff may allege that Kimbrough, through the FCLEDC, instituted an express policy of denying inmates masks and testing. (See Docket Entry 2 at 21 (use of term "refused" suggesting affirmative denial of masks and testing).) Alternatively, Plaintiff may allege that Kimbrough, through the FCLEDC, instituted a policy in response

10

to COVID-19, but that the policy failed to include the provision of masks and testing to inmates, and in that sense (by omission) "refused [Plaintiff masks and testing . . . ." (Id.) Under either formulation, the allegations do not create a triable issue of fact as to whether Kimbrough acted with deliberate indifference.

E. Analysis

"In this case, the undisputed summary judgment record establishes that [Kimbrough] responded to the COVID-19 pandemic by putting in place measures designed to control the spread of COVID-19 in the [FCLEDC]." Horton v. Holloway, No. 5:20-CV-05138, 2021 WL 7185222, at *13 (W.D. Ark. Dec. 1, 2021) (unpublished), recommendation adopted, No. 5:20-CV-5138, 2022 WL 118418 (W.D. Ark. Jan. 12, 2022) (unpublished). Plaintiff arrived at the FCLEDC on or about April 9, 2020. (See Docket Entry 2 at 16; Docket Entry 38 at 1.) Prior to Plaintiff's arrival, the record reflects that the FCLEDC instituted several measures to respond to COVID-19, including "designat[ing] areas within the facility to house inmates suspected of having COVID-19" (Docket Entry 38 at 2), "screening jail staff, [] medical staff [], custodians, or any other contractors who entered the facility" (id.; see also Docket Entry 38-7 at 1) for elevated temperatures or symptoms of respiratory illness, suspending "public visitation . . . with the exception of attorney visits" (Docket Entry 38-7 at 1), and screening new intakes for elevated temperatures or "signs of respiratory illness"

11

(Docket Entry 38 at 2-3; see also Docket Entry 38-8 at 2). In the days following Plaintiff's arrival, the FCLEDC implemented further measures, including "requir[ing staff] to wear a N95 mask in addition to gowns, goggles, and gloves" (Docket Entry 38 at 4) if interacting with a new intake who had COVID-19, and placing "hand sanitizer . . . throughout the facility" (id.; see also Docket Entry 38-14). By the end of April, the FCLEDC "required jail staff, inmate workers, medical staff and any contract workers to wear N95 masks if they were assigned to a new intake housing unit . . . [and] required all jail staff, medical staff, inmate workers, and contractors to wear surgical masks throughout the entire facility when interacting with inmates." (Docket Entry 38 at 4; see also Docket Entry 38-15; Docket Entry 38-16).

Although an affidavit attached to the Summary Judgment Motion avers that, "during this time[,] inmates were [also] given two masks . . . [which t]hey could . . . exchange . . . out on a nightly basis" (Docket Entry 38 at 4-5), the email announcing this new policy (cited as support for the statement in the affidavit) dates from October 2020, not April 2020 (see Docket Entry 38-31) and apparently applied to new intakes, not the general inmate population (see id.). The record also reflects that the FCLEDC likely did not provide surgical masks to the general inmate population until June 12, 2020, at the earliest. (See Docket Entry 38-20 (memorandum announcing "[t]emporary" and "**new** [p]rocedure" of

12

"pass[ing] out surgical masks to all the current inmates/residents" and "recommend[ing] . . . that the inmates/residents wear the masks for the next fourteen days" (emphasis added)). The record indicates that the FCLEDC established this new and temporary policy as a response to "5 staff members [who] tested positive for the [corona]virus" on June 12. (Docket Entry 38 at 2; see also Docket Entry 38-20).) Accordingly, construing the facts in a light most favorable to the Plaintiff (as the Court must a this juncture), the record does not establish that the FCLEDC provided masks to the general inmate population (except inmate workers, see Docket Entry 38-15; Docket Entry 38-16) prior to June 12, 2020.

Nonetheless, June 12 represented the first occasion on which anyone associated with the FCLEDC, staff or inmates, tested positive for COVID-19. (See Docket Entry 38 at 2; Docket Entry 38-1 at 1.) That fact, uncontroverted by any allegations in the Complaint (much less competent evidence), must therefore establish the starting date for Plaintiff's claim that Kimbrough denied Plaintiff "masks and testing . . . for more than [two-and-a-half] months *while* 11 officers tested positive" for COVID. (Docket Entry 2 at 21 (emphasis added).) This conclusion finds further support in the fact that Plaintiff filed his Complaint on August 26, 2020 (see id. at 1 (filing stamp reflecting August 26, 2020, filing date)), two-and-a-half months after June 12.

13

As such, the record as developed through discovery contradicts Plaintiff's allegation that Kimbrough "refused [Plaintiff] masks . . . *while*" (id. at 21 (emphasis added)) staff at the FCLEDC tested positive for COVID-19. Rather, on the same day that five staff tested positive for COVID-19, the FCLEDC "passed out surgical masks to all the current inmates/residents." (Docket Entry 38-20.) Plaintiff's unverified allegation to the contrary does not suffice for purposes of summary judgment. See Custer, 12 F.3d at 416. Kimbrough has therefore established the lack of a genuine issue of material fact as to whether he, by means of FCLEDC policy "refused [Plaintiff] masks . . . for COVID for more than [two-and-a-half] months while 11 officers tested positive" for COVID-19. (Docket Entry 2 at 21.) Under the circumstances, no reasonable fact-finder could attribute deliberate indifference to Kimbrough in his personal, official, or supervisory capacities as to the mask-aspect of any deliberate indifference claim.

Plaintiff's unverified allegation regarding testing fares no better. As noted above, because Plaintiff arrived at the FCLEDC on or about April 9, 2020 (see Docket Entry 38 at 1; Docket Entry 2 at 16), the first FCLEDC staff tested positive for COVID-19 on June 12, 2020 (Docket Entry 38 at 2; see also Docket Entry 38-20), and Plaintiff filed his Complaint on August 26, 2020 (Docket Entry 2 at 1), the two-and-a-half month period underlying Plaintiff's allegations must span from approximately June 12 to August 26,

14

2020.  But the record reflects that, on June 25, 2020, "the FCLEDC arranged for a [mandatory] mass [COVID-19] testing event for all inmates and staff."  (Docket Entry 38 at 6; see also Docket Entry 38-21 at 1.)  This testing event spanned several days, and although four additional staff tested positive for COVID-19, no inmates returned positive results.  (See Docket Entry 41 at 1-2.)  The record reflects that Plaintiff received a COVID-19 test during this event.  (See id. at 2; see also Docket Entry 41-1.)  The record also reflects that Plaintiff received an additional COVID-19 test on August 7, 2020 (see Docket Entry 41-2), and again tested negative for COVID-19 (see id.).  In fact, in a grievance form Plaintiff submitted to the FCLEDC on August 10, 2020, and attached to his Complaint, Plaintiff references this August 7 COVID-19 test. (Docket Entry 2-1 at 2 (stating that, after placement in quarantine due to possible COVID-19 exposure, FCLEDC staff treated Plaintiff "as if [he is] positive for Covid, when [his t]est results were negative!").)

Accordingly, the record as developed through discovery contradicts Plaintiff's allegation that Kimbrough "refused [Plaintiff] . . . testing . . . for more than [two-and-a-half] months *while*" (Docket Entry 2 at 21 (emphasis added)) staff at the FCLEDC tested positive for COVID-19.  On the contrary, Plaintiff received his first COVID test just two weeks after the first staff at the FCLEDC tested positive for COVID-19.  (See Docket Entry 41-

15

1; see also Docket Entry 38 at 6; Docket Entry 38-21 at 1.) Plaintiff received a subsequent COVID-19 test six weeks later (see Docket Entry 41-2), which (like the first) returned a negative result. Plaintiff's unverified allegation to the contrary does not suffice for purposes of summary judgment. See Custer, 12 F.3d at 416. Kimbrough has therefore established the lack of a genuine issue of material fact as to whether he, by means of FCLEDC policy, "refused [Plaintiff] . . . testing for COVID for more than [two-and-a-half] months while 11 officers tested positive" for COVID-19. (Docket Entry 2 at 21.) No reasonable fact-finder could attribute deliberate indifference to Kimbrough in his personal, official, or supervisory capacities as to the testing-aspect of any deliberate indifference claim.[3]

## CONCLUSION

Because the record lacks evidence from which a reasonable fact-finder could conclude that Kimbrough exhibited deliberate indifference to Plaintiff's serious medical needs, Kimbrough has shown entitlement to judgment as a matter of law.

---

3 Given that proposed resolution, the Court need not reach qualified immunity as an alternative basis for granting judgment for Kimbrough. See Brooks v. Johnson, 924 F.3d 104, 119 n.6 (4th Cir. 2019) ("recogniz[ing] the 'special problem' raised when the objective qualified immunity standard is applied to an Eighth Amendment violation that requires wrongful intent in the form of 'deliberate indifference'" (quoting Rish v. Johnson, 131 F.3d 1092, 1098 n.6 (4th Cir. 1997))).

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 36) be granted.

This 10th day of January, 2023.

>       /s/ L. Patrick Auld
>     **L. Patrick Auld**
> **United States Magistrate Judge**